***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner DeLuca and the briefs and arguments of the parties. The appealing party has shown good ground to reconsider the evidence. Accordingly, the Full Commission reverses the Opinion and Award of the Deputy Commissioner and enters the following Opinion and Award.
 ***********
The undersigned finds as facts and concludes as matters of law the following, which were entered into by the parties in a pre-trial agreement as:
 STIPULATIONS
1. The Opinion and Award by Deputy Commissioner Wanda Blanche Taylor filed on December 13, 2002, is a part of this record. *Page 2 
2. The stipulations, testimony at trial, deposition testimony, exhibits and other evidence before Deputy Commissioner Taylor when the Industrial Commission filed its Opinion and Award are a part of this record.
3. No compensation for total disability or any other benefits has been paid to plaintiff for the time period beginning August 25, 2003, through the present.
4. Plaintiff received short term and long-term disability benefits. Plaintiff paid premiums for both plans. Any long-term benefits in excess of $100.00 per month are reduced by workers' compensation benefits received. Plaintiff will be obligated to refund the disability benefits once he is paid workers' compensation benefits in this case to MetLife and to CIGNA through its agent, Q-Sure.
5. The stipulations contained in the parties' pre-hearing agreement are incorporated as though fully restated herein and the exhibits admitted into evidence by the stipulations in the Pre-trial Agreement are incorporated into this record.
6. The Pre-trial Agreement, Plaintiff's Exhibits 1 — 15, and additional medical records from Dr. Gusto and Dr. Blazing were stipulated into evidence.
 ***********
Based upon all of the evidence produced at the hearing, the undersigned makes the following:
 FINDINGS OF FACT
1. Plaintiff is 48 years old, having a date of birth of January 15, 1959. For more than 20 years, he has been employed by American Airlines. Eighteen of those years have been as an automotive mechanic. Although plaintiff continues to be employed by American Airlines, he has been on continuous medical leave since August, 2003. *Page 3 
2. Plaintiff's work as a mechanic involved maintenance on heavy machinery for defendant-employer. His work was very strenuous, involving lifting, pulling, and overhead work. Often plaintiff's job required overhead work on 200 — 300 pound transmissions that had to be balanced on stands and pushing and pulling up to 400 pounds.
3. On January 18, 2000, plaintiff was pulling a large dolly, or heavy cart, containing snow plows into position under a crane. There were two or three inches of snow on the ground, and the surface was very wet. Plaintiff slipped and fell to the ground. While he was holding onto the dolly with his left arm, the dolly rolled over him. Plaintiff sustained injuries to his low back, left shoulder, and leg.
4. Plaintiff was treated at the Rex Hospital Emergency Department immediately following the injury. He was also treated by Dr. Tejpal Dhillon at Dhillon Orthopedics and Dr. McDaniel of Raleigh Orthopedics and received physical therapy. Dr. Dhillon diagnosed plaintiff with acute thoracic spine and lumbrosacral sprain. Dr. McDaniel diagnosed him with left trapezius thoracic sprain.
5. From May 4, 2000, through August 2001, plaintiff saw Dr. Scott Sanitate, a physiatrist at Carolina Back Institute. Dr. Sanitate treated plaintiff with a TENS unit and a number of trigger point injections. Although the injections provided plaintiff with some relief, plaintiff continued to suffer pain and experienced aggravation of his pain at work.
6. Dr. Sanitate continued plaintiff on modified duty until June 12, 2000, when he released plaintiff to full duty. Although he returned to full duty, plaintiff occasionally had to miss work because of increasing pain.
7. Dr. Brian Szura at Cary Orthopedics saw plaintiff on July 14, 2000. Dr. Szura indicated that plaintiff suffered from a chronic periscapular strain with atrophy of supraspinatus. *Page 4 
Dr. Szura indicated that plaintiff did not wish to have restrictions on his work activity and recommended continued trigger point injections and physical therapy.
8. After Dr. Sanitate indicated he had no other treatment options for plaintiff short of surgery, Dr. Peter Gilmer, an orthopedic surgeon at Triangle Orthopedics, saw plaintiff on August 8, 2001. Dr. Gilmer diagnosed chronic left shoulder periscapular pain and ordered a cervical MRI. On August 30, 2001, plaintiff again saw Dr. Gilmer. Pursuant to plaintiff's motion and an order by Special Deputy Commissioner Matthew D. Harbin on October 24, 2001, Dr. Gilmer became the authorized treating physician for plaintiff's shoulder condition.
9. After reviewing the results of the MRI, which did not reveal any clear pathology, Dr. Gilmer referred plaintiff to Dr. John Giusto, a physiatrist in the same practice, for chronic pain management.
10. Dr. Giusto began treating plaintiff on September 6, 2001, using various modalities, including osteopathic manipulation. He diagnosed plaintiff with chronic myofascial shoulder pain. Dr. Giusto prescribed physical therapy in October 2001 and began performing trigger point injections.
11. Dr. Giusto returned plaintiff to full duty work on November 5, 2001. On January 9, 2002, Plaintiff reported that the heavy labor he performed at work during the snowstorm had aggravated his condition, including his shoulder and low back. Dr. Giusto performed osteopathic manipulation and trigger point injections.
12. At his February 28, 2002 visit, plaintiff reported an additional aggravation that occurred while moving an alternator at work. Dr. Giusto removed plaintiff from work for the period from February 25, 2002, through March 4, 2002. Dr. Giusto noted that plaintiff was doing fairly well and working full duty at the office visit of March 20, 2002. *Page 5 
13. Dr. Giusto saw plaintiff for increased pain on April 30, 2002, and treated plaintiff with injections, manipulation and medications. On July 19, 2002, plaintiff underwent electrodiagnostic testing to determine the cause of pain in his fingers and around the shoulder girdle. Dr. Giusto determined that the change was related to his myofascial pain. Plaintiff was noted to be doing better with the injections. No other abnormalities were found.
14. In late 2002 through mid-2003, plaintiff received monthly shoulder injections and took pain medication and muscle relaxants. Plaintiff typically would experience pain from the injection for a few days, then relief for a week or two, and then gradually increased pain. Plaintiff continued working for defendant-employer in his pre-injury job during this time period.
15. Plaintiff was able to work through August 25, 2003. Plaintiff had gone to the hospital a few days prior due to shoulder pain. However, when he arrived at the hospital complaining of shoulder pain, the doctors examined plaintiff's heart and discovered a blockage in plaintiff's main artery.
16. On August 26, 2003, plaintiff presented to Dr. Joseph Guzzo for a cardiology consultation regarding chest discomfort. Plaintiff complained of chest tightness associated with perspiration and a headache. Dr. Guzzo performed an exercise tolerance test which showed equivocal inferior EKG changes. Dr. Guzzo determined that plaintiff's symptoms suggested new onset angina. On that same day, Dr. Guzzo performed a cardiac catheterization to evaluate plaintiff's coronary anatomy and left ventricular function.
17. On August 27, 2003, plaintiff presented to Dr. Robert Peyton with Carolina Cardiovascular for a surgical consultation. Plaintiff complained of chest pain that radiated in his left shoulder as well as left finger tingling. He stated that he had been diagnosed with chronic left shoulder pain, but that the pain felt different now. Specifically, he felt more heaviness in his *Page 6 
chest than before and he actually began experiencing shortness of breath two or three months prior. On that same day, Dr. Peyton performed coronary artery bypass surgery. Plaintiff was discharged from the hospital on September 1, 2003.
18. On October 1, 2003, plaintiff returned to Dr. Giusto and complained that his shoulder pain had worsened. However, plaintiff admitted that his heart and shoulder pain symptoms were often similar and that it was difficult to differentiate between the two. Plaintiff also testified that following the open heart surgery he experienced pain and difficulties associated with an unstable sternum.
19. At his October 29, 2003, visit with Dr. Giusto, plaintiff's shoulder continued to be painful. His symptoms were tightness, binding, clicking, limited and painful range of motion. As far as symptoms related to the surgery, however, plaintiff was improving. After that visit, his condition overall continued to fluctuate but plaintiff continued to complain of the same shoulder joint pain as he had during his visits prior to the surgery.
20. Plaintiff first saw Dr. Michael Blazing on December 11, 2003. Dr. Blazing is board certified in internal medicine and cardiology. During his visit, plaintiff reported discomfort over his left breast area medially and up the middle of his sternum, discomfort with exertion, and sharp and knifelike pain in his left shoulder which radiated down his chest. Dr. Blazing testified that it was not uncommon for a patient to experience ongoing chest wall tenderness following a coronary artery bypass graft. Dr. Blazing also explained that the procedure can result in an unstable or non-union of sternum, which can cause ongoing pain.
21. On April 28, 2004, Dr. Giusto reported that plaintiff's heart surgery had been complicated by an unstable sternum and that it would be another six months before plaintiff could go back to work as a result. *Page 7 
22. On August 16, 2004, plaintiff saw Dr. Hadley Callaway, board certified in orthopedic surgery, for an independent medical examination. Plaintiff reported pain in the periscapular region and Dr. Callaway noted pain with twisting that might indicate impingement. Dr. Callaway diagnosed chronic muscular injury involving the trunk and periscapular area. Dr. Callaway recommended plaintiff be weaned from the trigger point injections and narcotics plaintiff had been receiving from Dr. Guisto on a regular basis, feeling that such treatment should not be continued indefinitely. Dr. Callaway testified that at that time there was no evidence that plaintiff needed any restrictions and that a full duty release was appropriate.
23. Dr. Blazing next saw plaintiff on August 17, 2005. At that visit, Plaintiff complained of two types of chest pains, pulling leg pressure and pain when he walked. Pain was reproducible with exertion and was sometimes reproducible with palpation, sometimes not. The walking pressure was relieved occasionally with nitroglycerine, so Dr. Blazing believed it could be heart related and performed an MRI on October 21, 2005, which showed no evidence of ischemia (restricted blood flow). Plaintiff was scheduled to return on December 27, 2005 but plaintiff failed to show for the appointment.
24. In his deposition, Dr. Giusto testified that plaintiff is physically capable of returning to work. Specifically, Dr. Giusto testified that plaintiff's left upper extremity was relatively stable and that plaintiff was capable of overhead work, lifting, pushing, and pulling in the ten-pound range. Dr. Giusto admitted that plaintiff's shoulder condition simply prevented plaintiff from returning to his previous job.
25. Dr. Giusto further testified that it was his opinion that plaintiff's shoulder condition worsened as a result of the heart surgery. He opined that during the coronary artery bypass surgery, plaintiff's chest was opened and the rib cage was separated, which triggered *Page 8 
plaintiff's nervous system, stimulated the nerves, and caused additional shoulder pain and dysfunction. However, on cross-examination, Dr. Giusto admitted that there was no objective evidence or nerve testing to document this alleged neuropathic pain of which plaintiff complained and that the EMG was negative for nerve damage. Dr. Giusto admitted that his opinion was based primarily on plaintiff's subjective complaints. When asked to provide a basis for his opinion that plaintiff's open heart surgery aggravated plaintiff's shoulder injury, Dr. Giusto indicated that it "seemed" causally related to the original injury because there was no problem with his left arm in terms of keeping him out of work before the open heart surgery and significant aggravation of the left shoulder condition after the open heart surgery.
26. Dr. Blazing testified to a reasonable degree of medical certainty that plaintiff's heart procedures would not have impacted plaintiff's shoulder injury. Contrary to Dr. Giusto's testimony, Dr. Blazing testified that nerve damage typically does not occur as a result of heart surgery. Additionally, Dr. Blazing testified that there was nothing objective to relate plaintiff's current problems to his 2000 shoulder injury and that there was no physiological reason why plaintiff could not return to work, especially since plaintiff was functional and working prior to his cardiac surgery.
27. The Full Commission gives greater weight to Dr. Blazing's testimony over Dr. Giusto's on the issue of whether plaintiff's heart surgery aggravated his shoulder injury.
28. In his deposition, Dr. Callaway testified plaintiff could presently perform regular work, and that at a minimum plaintiff could do work that did not require heavy lifting or overhead use of the arm. Although Dr. Callaway indicated that some activities such as heavy lifting and overhead work could cause pain in plaintiff's shoulder, he testified that this pain alone is insufficient to prove plaintiff's disability. *Page 9 
29. Dr. Callaway testified that no specific treatment would benefit plaintiff's chronic muscular injury. Dr. Callaway also testified that there was no objective evidence in the EMG or MRI to suggest that plaintiff's condition had a nerve component and that he found it hard to support additional treatment without such objective evidence.
30. Drs. Callaway and Giusto agreed that plaintiff's condition cannot be corrected by surgery.
31. Dr. Callaway recommended that plaintiff be weaned from the narcotic medications and trigger point injections currently prescribed by Dr. Giusto as these forms of treatment create a dependency and make it hard for patients to break through the problem. With respect to narcotic medications, Dr. Callaway testified that narcotics were not good for treating or curing the underlying problem causing the pain; rather, narcotics mask the pain. Dr. Callaway also testified that he typically did not use narcotic medications to treat chronic muscular injuries.
32. Dr. Callaway testified that the trigger point injections were not medically necessary and that if they were going to cure the problem, a limited course would have been successful. Moreover, he testified that plaintiff having received an injection every 3 to 5 weeks since 2001 was excessive and that this was not the way to work toward a cure. Dr. Callaway further stated that the trigger point injections may have been carried on longer than appropriate based on the absence of improvement of plaintiff's condition. Dr. Giusto conceded that an argument could be made against administering the trigger point injections.
33. Based upon the greater weight of the evidence, the Full Commission finds that there is insufficient evidence that plaintiff's current disability is the result of his January 2000 injury. *Page 10 
34. Further treatment with Dr. Giusto, including trigger point injections and narcotic medications, is not reasonably medically necessary for the relief or cure of plaintiff's condition.
35. There is insufficient evidence to establish that plaintiff requires ongoing medical treatment related to his January 2000 injury.
 ***********
Based upon the foregoing findings of fact, the undersigned makes the following:
 CONCLUSIONS OF LAW
1. Disability is the incapacity because of injury to earn the wages which the employee was receiving at the time of the injury in the same or any other employment. N.C. Gen. Stat. § 97-2(9). The plaintiff bears the burden of showing that he is unable to earn the same wages that he had earned before the injury, either in the same employment or in other employment, and that the diminished earning capacity is a result of the compensable injury. Hilliard v. Apex Cabinet Co., 305 N.C. 593,290 S.E.2d 682 (1982).
2. An employee may meet the initial burden of production by producing one of the following: (1) medical evidence that he is physically or mentally, as a result of the work-related injury, incapable of work in any employment; (2) evidence that he is capable of some work, but that he has, after a reasonable effort, been unsuccessful in his efforts to obtain employment; (3) evidence that he is capable of some work, but that it would be futile because of preexisting conditions, such as age, inexperience, or lack of education, to seek employment; or (4) evidence that he has obtained other employment at wages less than his pre-injury wages. Russell v. Lowes Product Distribution, 108 N.C. App. 762, 765,425 S.E.2d 454, 457 (1993). The greater weight of the evidence shows that, with respect to plaintiff's shoulder condition, plaintiff is physically capable of returning to work in some capacity. Further, plaintiff has failed to meet his burden *Page 11 
under any of the other prongs of the Russell test. Accordingly, plaintiff has failed to establish ongoing disability due to his work-related injury.
3. Plaintiff failed to carry the burden of proving by competent evidence that a causal relationship existed between the work-related shoulder injury in 2000 and plaintiff's alleged disability following his 2003 heart surgery. Click v. Freight Carriers, 300 N.C. 164,265 S.E.2d 389 (1980).
4. Dr. Giusto shall no longer be an authorized treating physician for plaintiff's compensable shoulder injury. Plaintiff failed to present competent medical evidence that he requires any further medical treatment related to his 2000 compensable injury. N.C. Gen. Stat. §§97-2(19), 97-25, and 97-25.1.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the undersigned makes the following:
 AWARD
1. Plaintiff's claim for additional compensation benefits related to his compensable 2000 injury is hereby DENIED.
2. Dr. John Giusto is no longer an authorized treating physician for plaintiff's compensable injury.
3. Defendants shall pay the costs of this action.
This 9th day of May 2007.
 S/_______________________ BUCK LATTIMORE CHAIRMAN *Page 12 
CONCURRING:
 S/_______________________ DIANNE C. SELLERS COMMISSIONER
DISSENTING:
 S/_______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER *Page 13